UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

Plaintiff,

v.

ZURYESS ROBERTS, *et al.*,

Defendants.

Case No. 3:18-cr-00097-MMD-WGC

ORDER

## I.    SUMMARY

Defendant Zuryess Roberts, who was 18 years old at the time he was arrested and interrogated by police officers, has brought three separate motions to suppress in this action. (ECF Nos. 34, 35, 38.) The first motion seeks to suppress contents recovered from his cellphone upon the execution of a warrant. (ECF No. 34.) The second motion seeks suppression of statements Defendant made in responding to questioning by the officers. (ECF No. 35.) The third motion asks the Court to suppress items that were seized upon a search of Defendant and the car he was driving. (ECF No. 38.)[1] For the reasons below, the Court will grant the first motion in full. The Court will grant the other two motions in part and denied them in part.

## II.    FACTUAL FINDINGS

The underlying facts are not in dispute and derive from the parties' exhibits and testimony at the Hearing. (*See* ECF No. 55.)

///

///

---

[1]In addition to the motions, the Court has also considered the accompanying responses (ECF Nos. 46, 47, 48) and replies (ECF Nos. 51, 52), as well as the testimony and evidence admitted at the evidentiary hearing held on December 10, 2019 ("Hearing"). Where exhibits admitted at the Hearing were also filed on the docket, the Court will cite to the ECF No.

On January 17, 2019, Defendant was charged by superseding indictment with four counts: conspiracy to steal, take or carry away firearms from the premises of a federal firearms licensee under 18 U.S.C. §§ 922(u) and 371 (Count One); theft of firearms from the same such premises under 18 U.S.C. §§ 922(u) and 924(i)(1) (Count Two); possession of stolen firearms under 18 U.S.C. §§ 922(j) and 924(a)(2) (Count Three); and transportation of stolen firearms under 18 U.S.C. §§ 922(i) and 924(a)(2) (Count Four). (ECF No. 20.)

## A. Search of Defendant and Car He Was Driving

The charges stem from Defendant's arrest on September 30, 2018, and related events. On that day, a few minutes after 7:30 p.m., Officers Michael Jones and Wesley Pittman of the Vallejo Police Department ("Vallejo PD") (collectively, "Officers") responded to reports of shots heard in the area. (ECF No. 38-10.) Several minutes past 8:00 p.m., the Officers were driving their marked police car in the area of Concoran Avenue and Mini Drive when they noticed the car Defendant was driving. (*Id.* at 2; ECF No. 38-1 at 2 (police narrative).) The car was a dark colored Toyota Camry which approached the Officers going northbound as they traveled southbound. (*Id.*) The Officers noticed that the car's lights were "not fully turned on." (*Id.*) Jones ran a records check on the car, which revealed the car's registration had expired the year before. (*Id.*) The Officers watched as Defendant parked the car against the curb in a residential neighborhood. (*Id.*)

The Officers decided to stop Defendant based on a suspected violation of California Vehicle Code ("CVC") §§ 24250 and 4000(a). (*Id.*) The former requires that a vehicle be equipped with lighting equipment when driving during darkness. Cal. Vehicle Code § 24250. The latter requires that a vehicle be registered to be driven. *Id.* § 4000(a)(1). The Officers got out of their car and approached Defendant. (ECF No. 38-2 at 00:00–00:34.) According to the Officers' testimony at the Hearing, they had been calling after Defendant, but this was not captured on their body cameras. Defendant was not in the immediate vicinity of his car at this point. (*Id.*) Defendant was walking towards an apartment building when the Officers caught up with him. (*Id.*)

2

Officer Jones beamed his flashlight on Defendant and directed him to "come here." (*Id.* at 00:30–00:36.) As he approached Defendant, Jones told Defendant that the car he had been driving had registration that was over a year expired. (*Id.*) Defendant stopped walking and turned to face Jones, with his hands up and palms facing Jones. (*Id.*) Defendant transferred his keys from his left hand to his right hand. (*Id.*) Defendant slowly lowered his now empty left hand towards his waist, keeping his right hand raised. (*Id.*) Jones grabbed Defendant's left arm while telling him to, "keep your hands up." (*Id.* at 00:37.) While forcing Defendant's hands above his head, Jones repeatedly told him to, "relax man." (*Id.* at 00:37–00:41.) Defendant complied as Jones held his hands above his head and commanded Defendant to widen his stance. (*Id.* at 00:42–00:45.) Jones asked Defendant if he had identification on him and Defendant responded, "No sir." (*Id.* at 00:45–00:47). Jones indicated that he was detaining Defendant, "real quick" for driving without a license. (*Id.* 00:53–00:55.)  Approximately 25 seconds elapsed from the time Jones directed Defendant's attention to the time he "detained" Defendant.

Jones handcuffed Defendant, with Defendant questioning Jones' conduct and again asserting that he did not have identification on him. (*Id.* at 00:55–1:25.) Upon handcuffing Defendant, the Officers unzipped and searched his pockets. (*Id.* at 01:15–01:23.) From searching Defendant, the Officers took Defendant's keys, an Apple iPhone S ("Phone"), and a substantial sum of cash. (ECF No. 38-9 at 6.)

Thereafter, Jones sat Defendant in the back of the patrol car (ECF No. 38-2 at 01:38–01:40), while Pittman looked through the windows of the car Defendant had been driving, using his flashlight (ECF No. 38-4 at 0:00–00:30). Based on testimony at the Hearing, it became clear that Pittman then went back to the patrol car and asked Defendant a series of questions largely irrelevant to the traffic infractions. (*Id.* at 00:55–02:47.) Jones can also be heard simultaneously asking Defendant questions. (*Id.*) Pittman's questions included whether Defendant had ever been arrested, whether he was on probation or parole, whether he worked, how much he got paid, and asking multiple times whether there was anything illegal in the car. (*Id.*) As to the latter, Defendant

3

responded, "No." (*Id.*). This questioning was not preceded by either Officer reading Defendant his *Miranda*[2] rights. Shortly after, one officer stated on radio that Defendant was arrested "for pursuit and 148."[3] (*Id.* at 03:01–03:11.)

The Officers decided to search the car. In searching, Pittman began under the front driver seat. (ECF No. 38-7 at 00:00–00:35.) Pittman looked around the interior of the car before digging through a black backpack, tossing out items and looking at paperwork. (*Id.* at 00:35–01:30.) He made no notation of the items inside nor otherwise indicating that he was conducting an inventory search. (*Id.*) Pittman then moved to the backseat where he also moved items around, shining his flashlight on clothes and shoes. (*Id.* at 02:00–02:09.) He went to the trunk and opened a black bag, finding several firearms inside. (*Id.* at 02:09–02:25.) Pittman called Jones over, commenting, "Good thing we're going to inventory this thing." (*Id.* at 02:30–02:38.)

One body camera video also showed Jones searching in the trunk of the car. (ECF No. 38-6 at 00:30–00:48.) At the Hearing, the government pointed out that this video shows Jones picking up a sheet (claimed for inventory) after Pittman's search—i.e., after the discovery of the firearms. (*Id.*) In the video, Jones removed spare tires from the car's trunk. (*Id.* at 00:48–01:01.) He also lifted and inspected the area under the trunk lining before replacing the spare tires and closing the trunk. (*Id.* at 01:00–01:15.) Jones then pushed the car's rear passenger window down and examined a bag therein by lifting it up. (*Id.* at 01:15–01:24.) Jones did not look inside the bag. (*Id.*) He then checked behind and under the car's rear passenger seat and tossed some items around in the car, before moving to the front passenger seat. (*Id.* at 01:24–02:10.) Jones made *no notations of the items* inside the car *during* this search, which concluded with him picking up a piece of paper that was inside the car and then turning off his body camera. (*Id.* at 02:10–02:58.)

///

///

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] Jones clarified at the Hearing that the "for pursuit and 148" statement concerned events unrelated to Defendant's arrest here.

Ultimately, the Officers seized the firearms, clothes, shoes, a backpack, and the cash found in Defendant's pocket and a wallet containing a substantial amount of additional cash and applied to forfeit those assets. (ECF No. 38-1 at 2–3; ECF No. 48-4 at 2.) Subsequent investigation into the firearms revealed that they had been stolen from gun stores in Sparks and Reno, Nevada ("Stores"). (*E.g.*, ECF No. 34-1 at 4–5.)

### B. Questioning

After his arrest, Defendant was brought to the police station where he was interrogated by Pittman, beginning around 10 p.m. (ECF No. 35-1 at 00:00–00:34, 04:16–04:19.) Pittman prefaced his questioning, stating "I'm going to ask you some questions, but it's kinda just routine, dude. I'm going to read you your rights real quick, okay?" (*Id.* at 00:34–00:36.) He then recited a *Miranda* warning, asking Defendant if he understands. (*Id.* at 00:36–01:11.) Defendant nodded his head that he understood, and Pittman began his questioning. (*Id.*) Pittman began by asking background questions, including who Defendant lived with. (*Id.* at 01:00–1:30.) Defendant responded, informing that he lived with his mother. (*Id.*) Defendant shortly thereafter mentioned "I'm tired bro." (01:36–01:37.) Defendant also confirmed, in response to a question, that he had not yet graduated. (02:02–02:19.) Roughly another 28 minutes of questioning passed when Pittman decided to leave. (*Id.* at 02:19–30:40.) During the passing time, Pittman's questions largely focused on the purchase of the car and related circumstances, where Defendant was going at the time of his arrest, where Defendant got the money he had on him and other money-related questions, and where Defendant spent the two previous days—September 28 and 29. (*Id.*) To the latter question, Defendant informed that he had spent those says in Vallejo. (*Id.* at 11:28–12:35.)

Before leaving, Pittman told Defendant that he had some important questions to ask him, and that he wanted Defendant to think about what he wanted to share with him. (*Id.* at 30:33–32:14.) He reminded Defendant of his age and noted that he did not want what happened to affect the rest of Defendant's life and advised Defendant that he needed to tell the truth because he would be able to corroborate whatever Defendant said. (*Id.*)

Pittman then stated that he would be back in "five minutes" and left the room. (*Id.* at 31:36–32:23 (T05:34:32Z.)

According to testimony at the Hearing, the interrogation resumed after 3 a.m., hours later. (ECF No. 35-5 at 09:20–09:44.) As he was entering the interrogation room,[4] Defendant looked sleepy and stated that he was cold. (*Id.* at 09:31–09:32.) This time, the interrogating officer was Detective Eron Hurley from the Sparks Police Department in Nevada. Hurley informed Defendant that they would be having a little conversation. (*Id.* at 09:32–09:45.) The detective pulled out a piece of paper and began by asking Defendant his name, while Defendant shivered and yawned. (*Id.* at 09:44–11:00.) After causally asking numerous questions and chatting with Defendant over an extended period of time, Hurley finally asked Defendant if he had ever been read his *Miranda* warnings. (*Id.* at 11:00–31:49.) Defendant explained that Pittman had read him the *Miranda* warnings. (*Id.* at 31:50–32:00.) Hurley read through the warnings again, asked the Defendant if he wanted to talk to him, and indicating he was just "still" having a conversation. (*Id.* at 32:00–32:24.) Defendant affirmed that he wanted to talk to Hurley. (*Id.*) Defendant continued yawning and Hurley said: "you gotta quit yawning dude, you're gunna make me tired." (*Id.* at 32:46–32:54.) Thereafter, Hurley continued his questioning, which, in its entirety, lasted about another three and a half hours, with the detective confronting Defendant with evidence, and Defendant making inculpatory statements. (*Id.* at 33:00–3:59:40.)

Notably, during Hurley's questioning, Defendant expressed concerns about his epilepsy and yawned throughout. (*Id.*; *see also* ECF No. 35-3 at 43, 227.) For example, as Defendant was slurring over his words, Defendant stated that it was 3 a.m. and he "didn't know," while informing Hurley that he has epilepsy. (ECF No. 35-5 at 37:54–38:02.) Hurley responded: "That's not good. All right bud, I want you to sign on here if you're willing to talk to me." (*Id.* at 38:02–38:12.) It appears at this time, Hurley obtained Defendant's written waiver. (*Compare id.* at 38:08–38:16 *with* ECF No. 35-4.) Defendant yawned. (ECF

///

---

[4]Pittman testified at the Hearing that Defendant was left in the interrogation room instead of being moved to a cell because the room was more comfortable.

No. 35-5 at 38:16–38:27.) While Defendant yawned and was about to sign the paper, Hurley told him he could stop talking at any time, stating that they were just "documenting" and signing paperwork because they were having a "conversation." (*Id.*) Hurley directed Defendant to sign right above his name, and it is not clear that Defendant even read the paper. (*Id.* at 38:27–38:37.) At this point, Hurley mentioned that it was now October 1st at 4:04 a.m. (*Id.* at 38:37–38:49.)

Hurley started to get louder as the interview progressed, including a segment where he told Defendant he was already "screwed", but hopefully things could go better for Defendant if he worked with them—the police. (*See id.* at 1:39:49–1:45:08.) Over three hours into the interrogation, after Defendant had already made various inculpatory statements, including his role in the burglaries as a lookout, Hurley decided that they would take "like a five-minute break" and stated that Defendant could use the restroom during that time. (*Id.* at 3:00:00–3:00:32.) Several minutes later and Defendant reappearing looking sleepy with his left arm inside his jacket, Hurley is heard stating: "We'll make this quick. I know you've been up all night. Did you fall asleep for a second?" (*Id.* at 3:14:00–3:14:38.) Defendant responded, "Every time (inaudible) and I got epilepsy so it's kind of like. . ." (*Id.* at 3:14:38–3:14:43.) Before Defendant could finish, Hurley interrupted him, stating: "Uh oh. Well I got diabetes so we both got issues." (*Id.*) The interrogation resumed and went on for over another forty-four minutes, by which point Defendant's head and arms were on the interrogation table. (*Id.* at 3:59:24–3:59:34.)

At the Hearing it was revealed that Defendant was allowed to call his mother only after the interrogations concluded.

### C.     Cell Phone & Car Warrant

Officers obtained a search warrant to search Defendant's Phone. (ECF Nos. 34-1, 34-2.) A magistrate judge issued the warrant for information on the Phone from September 25, 2018, onwards. (ECF No. 34-2 at 5.) It is undisputed that during the execution of the warrant, the executing officer went beyond the date parameters provided for in the warrant. (*See, e.g.*, ECF No. 34 at 2; ECF No. 46 at 1, 3.)

### III. PHYSICAL SEARCH (ECF NO. 38.)

#### A. Search of Defendant

In briefing, Defendant argues that the car keys, Phone, and cash that were initially found on him should be suppressed based on (1) an improper *Terry* stop and frisk,[5] (2) an unlawfully prolonged stop, and ultimately (3) that he was not subjected to lawful *custodial* arrest at the time he was searched. (ECF No. 38 at 4–13; ECF No. 52 at 3–12.) The government argues, *inter alia*, that a *Terry* analysis is improper and otherwise contends that Defendant was searched pursuant to a lawful arrest under either *United States v. Robinson*, 414 U.S. 218 (1973)[6] or *United States v. Johnson*, 913 F.3d 793 (9th Cir. 2019), vacated on other grounds. (ECF No. 48 at 4–7.) The Court agrees with the government.

Under the search-incident-to-arrest doctrine, a search of a defendant does not violate the Fourth Amendment where the search is conducted upon a lawful arrest. *E.g.*, *Robinson*, 414 U.S. at 234–35. Neither a defendant's nor the police's subjective view of the circumstances determine whether a suspect has been subjected to a formal custodial arrest. *See Stansbury v. California*, 511 U.S. 318, 323 (1994) (citation omitted). Further, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *See, e.g.*, *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citations omitted).

As noted, the Officers decided to stop Defendant for operating an unregistered vehicle without his lights illuminated. Further, Jones testified that he decided to arrest Defendant after Defendant stated that he did not have identification on him.

///
///
///
///

---

[5]*See Terry v. Ohio*, 392 U.S. 1 (1968).

[6]Defendant also applies *Robinson* to this case. (ECF No. 52 at 3–4.) However, Defendant attempts to distinguish the arrest in this case as not amounting to a formal "custodial arrest" as provided for in *Robinson*. (*Id.*) Defendant's attempt is unpersuasive.

Defendant argues that Jones was correct when he articulated that he was "just" detaining Defendant[7] because officers had yet to confirm via an on-site database check that Defendant did not hold a valid driver license. (ECF No. 52 at 8.) Without citing to authority that an on-site database check is mandatory, Defendant contends that CVC § 12500 requires that type of verification, and thus probable cause was lacking at the time Jones handcuffed Defendant. (*Id.*)

The Court is not persuaded. It appears to the Court that it would be duplicative to have officers also conduct an on-site database check for license/identification where the subject has informed that he did not have identification. Moreover, the government specifically argues, among other things, that probable cause to arrest existed because the Officers observed Defendant driving and he admitted that he did not have identification (ECF No. 48 at 5–6). At the Hearing, defense counsel pressed on with the contention that Officers could not arrest Defendant for simply not having identification on him. But that is not the facts here. As stated, Jones testified consistent with the government's argument that he arrested Defendant at the noted juncture because Jones and Pittman had observed Defendant driving without his lights illuminated, in an unregistered vehicle, and when asked if he had identification Defendant stated he did not.

Nonetheless, defense counsel attempts to limit Defendant's affirmance that he did not have identification to simply being confirmation that he did not have identification *on him*, as opposed to not at all. (*E.g.*, ECF No. 38 at 3, 11–12.) In fact, Defendant suggests that the Officers arrested him too hurriedly without giving him a full opportunity to identify himself—by for example, producing materials from his wallet. (ECF No. 52 at 9.) While the Court is concerned about the quickness in the Officers' decision to arrest Defendant, there is no evidence suggesting that Defendant had materials on him that could be used to immediately establish his identity. It is reasonable for the Officers to have concluded, before arresting Defendant, that he possessed no form of identification—including a

///

---

[7]Moreover, an officer's "subjective state of mind" is not pertinent to the probable cause analysis. *See Devenpeck*, 543 U.S. at 153.

1   license. This is because Defendant stated nothing beyond that he did not have

2   identification on him. Surely, if Defendant had identification in the car he was driving or in

3   his wallet, he would have simply said so.[8]

4       Defendant additionally claims that an arrest was not compelled here, by either state

5   law or Vallejo PD policy. (ECF No. 52 at 8–11.) The contention is unavailing. Whether an

6   arrest is compelled misses the point. The issue is whether the arrest was authorized. In

7   *Atwater v. City of Lago Vista*, the Supreme Court clarified that the requirement of probable

8   cause is satisfied where a custodial arrest is authorized—not necessarily required. 532

9   U.S. 318, 534 (2001); *see also id.* ("If an officer has probable cause to believe that an

10  individual has committed even a very minor criminal offense in his presence, he may,

11  without violating the Fourth Amendment, arrest the offender.").

12      While CVC § 12500 does not expressly require arrest, California Penal Code §

13  853.5 permits it where, as here, the arrestee has no satisfactory identification. *See* Cal.

14  Pen. Code § 853.5(a) ("Only if the arrestee refuses to sign a written promise, has no

15  satisfactory identification, or refuses to provide a thumbprint or fingerprint may the arrestee

16  be taken into custody."); *see also People v. Spence*, 125 Cal. App. 4th 710, 718–19 (Cal.

17  App. Div. 2005) (noting that driving without a license can be charged as either an infraction

18  or a misdemeanor). The Court therefore concludes that the Officers had probable cause

19  to arrest Defendant.[9]

20      The Court additionally finds that Defendant was in custody upon being placed in

21  handcuffs by Jones and Pittman as it became apparent that Defendant was not free to

22  ///

---

[8]In fact, after the arrest and while Defendant was in the patrol car where Jones was obtaining his identification, Pittman asked Defendant if his identification is in the two backpacks inside the car. (ECF No. 38-4 at 3:12-38–3:12:50.)

[9]The Court does not address Defendant's arguments regarding the statement that Defendant was being arrested "for pursuit and 148" (ECF No. 38-4 at 3:01–3:11). *See, e.g.*, *Devenpeck*, 543 U.S. at 153–54 (holding that an arrest can be supported by probable cause, even if not closely related to offense invoked by officer). Moreover, as noted *supra*, Jones clarified at the Hearing that the statement concerned events unrelated to Defendant's arrest here.

leave at that moment. *See, e.g.*, *Stansbury,* 511 U.S. at 322 (providing that an individual is considered in custody when there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest"); *U.S. v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2019) (supporting that whether a defendant is free to leave without hindrance is a hallmark of whether he is under arrest); *see also United States v. Bengivenga*, 845 F.2d 593, 598 (5th Cir. 1988) (relying on the same premise and concluding that "[a] stop at a fixed checkpoint constitutes a Fourth Amendment seizure— a reasonable person would believe that she was not free to leave").

Because the Court finds that the search of Defendant was a lawful search incident to arrest the Court will deny Defendant's motion to suppress the keys, the Phone, and the cash obtained from the initial search of Defendant's person.

### B. Search of the Car Defendant was Driving[10]

Defendant next moves to suppress the firearms the Officers recovered from the trunk of the car and clothing found in a backpack in the car. (ECF No. 38 at 1, 13–20.) As to these items, Defendant argues: (1) no impound was necessary under a community caretaking rationale; (2) no valid inventory was ever conducted; and (3) the totality of the circumstances demonstrate that the vehicle impound was unreasonably pretextual. (*Id.*) The government contends that these items were lawfully recovered pursuant to a valid inventory search and that the execution of a valid search warrant on the car provides a separate basis allowing for the recovery of the clothes. (ECF No. 48 at 7–12.) As the

///

///

///

///

---

[10]In its responsive brief, the government argues that as a preliminary matter the Court should require Defendant to make a significant showing that he has standing to move to suppress the items found in the car. (ECF No. 48 at 12–13.) Defendant argues that standing is a non-issue because Defendant has a property interest and more than colorable possessory interest in the vehicle to satisfy standing under *Rakas v. Illinois*, 439 U.S. 128, 130 (1978). The government conceded at the Hearing that standing was in fact a non-issue. The Court agrees and will not address the matter further.

government notes, Defendant does not challenge the latter basis concerning the clothes. (*Id.* at 13.)

Warrantless searches are "per se unreasonable" under the Fourth Amendment and "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). The "community caretaking" doctrine is one such exception. *United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016). Under this doctrine, "police may, without a warrant, impound and search a motor vehicle so long as they do so in conformance with the standardized procedures of the local police department and in furtherance of a community caretaking purpose, such as promoting public safety or the efficient flow of traffic." *Id.* (citing *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012)); *see also United States v. Caseres*, 533 F.3d 1064, 1074 (9th Cir. 2008) ("Such warrantless inventory searches of vehicles are lawful only if conducted pursuant to standard police procedures that are aimed at protecting the owner's property and at protecting the police from the owner charging them with having stolen, lost, or damaged his property.") Even if an inventory search technically complies with the applicable policy, the Ninth Circuit has suggested that law enforcement officers should "sufficiently consider alternatives before impounding" a vehicle under the community caretaking doctrine. *See United States v. Maddox*, 614 F.3d 1046, 1050 (9th Cir. 2010) (applying the law of Washington State).

But the inventory search exception to the warrant requirement is subject to an important limiting principle—it cannot be used as pretextual cover to conduct warrantless searches for evidence of criminal activity. *See, e.g.*, *United States v. Hellman*, 556 F.2d 442, 443–44 (9th Cir. 1977). "The Supreme Court in allowing the impoundment and search of vehicles under the community caretaking doctrine has . . . allowed the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Miranda v. City of Cornelius*, 429 F.3d 858, 863 (9th Cir. 2005) (internal quotation marks and citations omitted). Said otherwise, to be a valid inventory search, "the purpose of the search must

be non-investigative; it must be conducted on the basis of something other than suspicion of evidence of criminal activity." *U.S. v. Johnson*, 889 F.3d 1120, 1125 (9th Cir. 2018) (citing *Torres*, 828 F.3d at 1118) (internal quotation marks omitted). An officer's subjective intent is relevant to this inquiry. *See id.* at 1125–26.

While the government bears the burden of showing that a warrantless search or seizure falls within an exception to the warrant requirement, *see United States v. Huguez-Ibarra*, 954 F.2d 546, 551 (9th Cir. 1992), the defendant bears the burden of showing that the inventory search was unreasonably pretextual, *see Johnson*, 889 F.3d at 1126. "The search cannot be a ruse for a general rummaging in order to discover incriminating evidence." *Johnson*, 889 F.3d at 1126 (internal citation and quotation marks omitted).

Here, the government argues that the search of the car was conducted pursuant to Vallejo PD policy and based on community caretaking concerns. (ECF No. 48 at 7–12.) Defendant relevantly argues that the search did not in fact comply with policy because the Officers did not document items found during the purported inventory and the documented record otherwise supports that the search was to find evidence of a crime. (*E.g.*, ECF No. 52 at 13–16.) The Court agrees with Defendant.

The government does not argue that the Officers did not document items *during* their search. Instead, the government argues that the search complied with policy where the officers ultimately documented only those items of "significant monetary value." (ECF No. 48 at 10.)[11] Relying on *United States v. Garay*, the government claims that an incomplete inventory sheet on its own does not invalidate an inventory search (*id.*). 938 F.3d 1108, 1112 (9th Cir. 2019) (providing that failure to complete an "inventory list that ordinarily would be completed as part of department inventory search is not, *on its own*, a material deviation from policy") (emphasis added). The government further points out that an officer's dual motive—one valid (*e.g.*, community caretaking) and one impermissible

///

---

[11] *United States v. Turnbow*, No. 3:18-cr-00001-MMD-WGC, 2019 WL 1261357, at *3 n.3 (D. Nev. Mar. 19, 2019) (the government bears the burden of demonstrating compliance with police inventory policy).

(i.e., to find evidence of a crime)—does not render the inventory search merely pretextual (*id.* at 11). *See, e.g.*, *United States v. Orozco*, 858 F.3d 1204, 1213 (9th Cir. 2017) (explaining that a dual motive does not establish pretext).

In totality of the circumstances, the Court finds that Defendant has met his burden to establish that the search was unreasonably pretextual. Aside from Defendant's contention that an inventory search was premature (ECF No. 52 at 13), Defendant points out that Vallejo PD policy does not leave it to the discretion of officers to only document items that are of significant monetary value (*id.* at 14). To be sure, Vallejo PD policy requires that "[a]ll property . . . shall be inventoried and listed on the vehicle storage form." (ECF No. 38-11 at 2 (§ 502.4).) Thus, the policy does not suggest leeway for officers to document only items that they believe to be of significant monetary value.

Further, § 502.4 of that policy specifically notes that the purpose of the inventory procedures is to protect "an owner's property while in police custody, to provide for the safety of officers, and to protect the Department against fraudulent claims of lost, stolen, or damaged property." (*Id.*) The testimony provided at the Hearing was that the car was inventoried to protect the department. However, the Court concludes that the Officers' search of the car did not comport with the noted policy because the search, by not meaningfully documenting the property in the car, undermines any aim in protecting the Vallejo PD against fraudulent claims of lost, stolen, or damaged property. The Court notes that during the search, Pittman—who purportedly conducted the inventory search based on testimony at the Hearing—merely ruffled things around, including items in a backpack—for example, a title to the car, shoes and clothes. Pittman's apparent carelessness does not support a conclusion that he was doing an inventory of items in the car.

Other evidence is also inconsistent with a finding that Pittman was in fact conducting an inventory search when he rummaged through and ultimately discovered the firearms and more indicative of a search for illegal evidence. First, shortly before searching the car, Pittman had engaged in asking Defendant a series of improper questions noted

*supra.* Multiple of those questions expressly asked Defendant if there was anything illegal in the car.

Second, upon discovering the firearms in the trunk of the car, Pittman is heard on video stating: "Good thing we're going to inventory this thing." (ECF No. 38-7 at 02:30–02:38.) At the Hearing, Pittman repeated his statement differently when asked by government counsel what he said. Pittman specifically stated that he said "it's a good thing we're inventorying this vehicle." This, of course, differs from the statement above, which Pittman stated on the video *at the time of the search.* The change in statement may amount to nothing or it could reflect a conscious or unconscious attempt to align the statement with the now argued theory of the search. Pittman further explained at the Hearing that by his statement he meant that it was a good thing they were following policy because the car could have been broken into and the guns would have been gone. These explanations indeed flow best from Pittman's amended statement. They are however inconsistent with Pittman's very conduct of not in fact following policy. Curiously, despite not documenting items on a sheet during the search, Pittman did not even attempt to use his body camera, which was on, to document items found by making note of them for the camera. That would surely have been more consistent with policy. Moreover, the Court accepts Pittman's statement as reflected on the video contemporaneous with his search. That statement in essence suggests that up until the point of discovering the firearms Pittman had not been in fact conducting an inventory of the car.

Third, at the Hearing it was confirmed that Jones—not Pittman who allegedly conducted the inventory search—completed an itemization of items found in the car. (*See also* ECF No. 48-4 at 3 (Jones' evidence report).) While nothing prohibits one officer from documenting inventoried items, albeit another performed the actual search, it does raise concerns. To this point, the video evidence shows Jones also searching the vehicle, including digging under the lining in the car's trunk and the car's backseat. There is testimony both that this was part of Jones documenting items *after* Pittman had already conducted the inventory search—which was allegedly observed by Jones—and that Jones

*helped Pittman in conducting the inventory search*. In any event, the manner in which Jones also rummaged through the car is inconsistent with either an attempt to properly inventory items or performing a search with that purpose in mind.

Further, while the government highlights that a vehicle storage form was completed pursuant to policy (ECF No. 48 at 10), no meaningful explanation was presented regarding the Officers' failure to make contact with a potential owner of the vehicle. To be clear, the government's contention is that the car was inventoried to further impoundment. (*E.g. id.* at 12 (arguing "[h]ere the clear directive of Vallejo PD policy was to impound and inventory the car, and the circumstances in which the car was found make clear that following the policy was reasonable").) But there is no evidence that the vehicle was formally impounded *before* Pittman began searching the vehicle, although the allegedly relied upon policy assumes impoundment before an inventory search. (ECF No. 38-11 at 2 (§ 502.4 providing that "[a]ll property in a stored or impounded vehicle shall be inventoried and listed on the vehicle storage form").)

Additionally, § 502.5 of the towing/impoundment policy states that "[u]nless it would cause an unreasonable delay in the completion of a vehicle impound/storage or create an issue of officer safety, officers should make reasonable accommodations to permit a driver/owner to retrieve small items of value or personal need . . . which are not considered evidence or contraband." (ECF No. 38-11 at 2.) Undisputedly, the Officers made no attempt before the search of the car to contact the car's owner. They suggest at the Hearing that that was because they did not know who the owner of the vehicle was. However, the Officers' own completed vehicle storage form lists "Bodie Albert" from Sacramento as the registered owner of the car. (*See* ECF No. 48-3.) Moreover, the Officers also testified that there was reason to believe that the car had been recently sold to a "Matthew Thurston." Thus, even if the Officers were not certain about the owner, they knew of two possibilities. Their failure to even attempt to reach out to either is inconsistent with having an objective of impounding the car. There is no contention that doing so would have caused an unreasonable delay in impounding the car.

16

Defendant also points out that the Officers have documented no community caretaking purpose anywhere in the record—either in any police report or on their body cameras. (ECF No. 52 at 15; *see, e.g.*, ECF No. 38-1 (the only completed police report, which Jones completed).) *Cf. United States v. Turnbow*, No. 3:18-cr-00001-MMD-WGC, 2019 WL 654456, at *6 (D. Nev. Feb. 15, 2019), *reconsideration denied*, 2019 WL 1261357 (D. Nev. Mar. 19, 2019) ("Notably absent from Sergeant English's police report is any discussion of his purported community caretaking motivations for the inventory search, such as concern about vandalism, or that the Car was not in a valid parking spot.").

Nonetheless, the government argues and the Officers later testified at the Hearing that they took to inventorying the car to further the aim of impoundment because the Officers were concerned that the car was located in a high crime neighborhood. (ECF No. 7, 9.) The Court is convinced that this is an after-the-fact contention.

Defendant points out that "[t]he citing of an area as 'high-crime' requires careful examination by the court, because such description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity" (ECF No. 52 at 15). *U.S. v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000). Courts "must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to *specific*, circumscribed locations *where particular crimes occur* with unusual regularity." *Id.*

Here, to support its high-crime contention, the government provides an exhibit revealing a significant number of service calls to both Vallejo PD and the city's fire department for the block on which Defendant was arrested, during the six months before the arrest. (ECF No. 48 (citing ECF No. 48-2).) But, as the defense points out, the government's exhibit does not support a finding of high crime with the particularity required under caselaw in the Ninth Circuit. (*See* ECF No. 52 at 15–16.) The exhibit does not specifically indicate that any *vehicle* had been vandalized in the six months before Defendant's arrest. (*See* ECF No. 48-2.) Further, only one vehicle had been reported

17

stolen, several months before the arrest—on March 31, 2018. (*Id.* at 2.) Thus, the government's exhibit falls short of supporting that the Officers had a basis to be concerned with "high crime" that would be *of particular concern to the car*. The Officers' testimony failed to suggest otherwise. Accordingly, the Court finds it "difficult to credit the [government's] new explanation[—not noted anywhere in the documented record—], which reeks of afterthought." *Miller-EL v. Dretke*, 545 U.S. 231, 246 (2005); *see also id.* (stating that the court of appeals' "readiness to accept the State's substitute reason ignores not only its pretextual timing but the other reasons rendering it implausible").

Based on this evidence, the Court concludes that the Officers had a single *bona fide*, and impermissible motive, in searching the car when they did—to find evidence of a crime. As such, the Court finds that the purported inventory search was unlawfully pretextual. *See, e.g.*, *Johnson*, 889 F.3d at 1133 (inventory searches are invalid if officer searched with subjective purpose to find evidence of a crime)[12]; *United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir. 1993) ("An inventory search is invalid if it was a pretext for an investigative search[,]" that is, where "only the investigative motive is bona fide."). Therefore, the Court will grant Defendant's motion to suppress the items found in the car pursuant to the inventory search.

Although the government argues that the execution of a valid search warrant on the car provides a separate basis allowing for the recovery of the clothes, the Court is not convinced that that warrant would be found valid at this point, given its findings *supra* and *infra*. In any event, the clothes at issue are listed in Jones' evidence report (*see* ECF No. 48-4 at 3), thus recovered as part of the invalidated search. The fact of a later-in-time search warrant does not cure the violation here. Accordingly, the Court will suppress the firearms, clothing, among other things, found during the search of the car.

///

///

---

[12]The government maintains, apparently for appeal, that the inquiry should be a subjective one as the Supreme Court held in *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006). (ECF No. 48 at 12.) The Court's conclusion, however, is not merely based on subjective purpose.

## IV.  *MIRANDA* WARNING AND VOLUNTARINESS (ECF NO. 35.)

Defendant seeks to suppress all statements made to police arguing: (1) officers violated his *Miranda* rights during three separate phases of questioning; and (2) his confessions were not voluntary. (*E.g.*, ECF No. 35 at 8–19.) The Court will grant the motion in part and deny it in part.

Before proceeding further, the Court notes that it will not rely on Defendant's expert witness's report and evaluation of Defendant in rendering its determinations here. To be clear, Defendant relies on a psychological evaluation of Defendant and report done by neuropsychological expert, Dr. Brian Leany, in arguing that he did not knowingly, intelligently, or voluntarily waive his *Miranda* rights in speaking to Pittman and Hurley. (ECF Nos. 35, 36.) In gist, Leany opines that his evaluation of Defendant revealed that Defendant has deficits such as relating to processing speed, working memory, oral language/listening comprehension, and executive functioning, that affected his ability to volitionally waive his *Miranda* rights. (*E.g.*, ECF No. 35 at 11–12; *see* ECF No. 36 (sealed neurological report (expressing concern about Defendant's potential suggestibility and likelihood to conform to perceived demands of authority figures)).) At the Hearing, defense counsel asked Leany to view the videos from Defendant's arrest and interrogations and explain how the claimed deficits were at play in a given instance. (*See also* ECF No. 36 at 8–11 (providing instances).) Leany concludes that based on Defendant's found deficits it is unlikely that Defendant understood or meaningful and voluntarily waived his rights.

Having reviewed the video evidence relative to Leany's evaluation and testimony, the Court cannot agree that Defendant's purported cognitive deficiencies were of the extent to alter his abilities as relevant to *Miranda* waiver. Specifically, Leany did not determine that Defendant was intellectually disabled. Leany also does not opine that Defendant possesses the type of low intelligence quotient (IQ) and English or reading proficiencies that would directly affect his ability to comprehend and make a judgment about whether to waive his *Miranda* rights. *See, e.g.*, *United States v. Garibay*, 143 F.3d 534 (9th Cir. 1998) (finding that the defendant's waiver was not knowing, intelligent, and

19

voluntary given the defendant's low IQ, poor English proficiency, and lack of Spanish-language advisements where defendant's primary language was Spanish).[13]

Nor is the Court convinced that Defendant's claimed deficits or general intelligence level—separate from whether he was worn out over the duration of his interrogations and tactics used by the officers—made him more susceptible to interrogative pressures. *See, e.g., U.S. v. Preston*, 751 F.3d 1008 (9th Cir. 2014) (involving an 18-year-old with an IQ of 65 and impaired cognitive functioning and concluding that the defendant was unusually susceptible to subtle forms of coercion that he was unable to willfully withstand interrogation); *id.* at 1016, 1021–22, 1028 (holding that "the officers' use of the methods employed here to confuse and compel a confession from the intellectually disabled eighteen-year-old before us produced an involuntary confession"). Accordingly, the Court will not further substantively consider Leany's neurophysiological evaluation of Defendant in considering the issues related to waiver.

The Court considers the following phases of questioning in determining whether Defendant's *Miranda* rights were violated: (1) questioning while Defendant was handcuffed in the patrol car—pre *Miranda* warnings; (2) questioning by Pittman at the police station; and (3) questioning by Hurley at the same.

### A.    Questioning While Defendant was in Patrol Car

Concerning Defendant's pre-*Miranda* questioning, the threshold questions are: (1) was Defendant in custody; and (2) if so, was he interrogated? *See, e.g., United States v. Robbins*, No. 3:15–cr–00070–MMD–WGC, 2017 WL 187150, at *3 (D. Nev. Jan. 17, 2017). Per the Court's conclusion above, Defendant was already in custody at the time of the patrol-car questioning. *See supra Stansbury*, 511 U.S. at 322. Thus, the only remaining

///

///

///

---

[13]In *Garibay*, the evaluating doctor advised that given the defendant's low IQ, he "would need a visual demonstration of his rights, personal experience, and repeated concrete instructions to intelligently waive his *Miranda* rights." 143 F.3d at 538 n.7. The court particularly emphasized the lack of translations provided. *Id.* at 538–39 & n.8.

inquiry is whether such questioning amounted to an interrogation. The Court finds it does[14] and the government conceded the issue at the Hearing. Accordingly, the Court will suppress Defendant's responses to the series of questions the Officers asked Defendant while Defendant was already handcuffed in the patrol car.

### B.   Questioning by Pittman & Hurley

### 1.   Knowing and Intelligent

As to both Pittman and Hurley, Defendant argues that he did not knowingly and intelligently waive his *Miranda* rights. The Court disagrees.

Regarding Pittman, Defendant waived his *Miranda* rights at the outset of that interrogation. Nonetheless, Defendant challenges his waiver contending that Pittman read the warning rapidly and conveyed that it was an unimportant formality and that the manner in which Defendant *nodded his head,* affirming he understood and wanted to talk to Pittman (ECF No. 35-1 at 1:10–4:10), does not demonstrate an actual understanding of either the right or its significance. (ECF No. 35 at 9–10.)

To the extent Defendant argues that his head nods, standing alone, does not indicate a willingness to waive his rights, the Court disagrees (*id.* at 11). *See, e.g.*, *North Carolina v. Butler,* 441 U.S. 369, 373 (1979) (explaining that a written or oral statement of waiver of the right to remain silent is not invariably necessary); *id.* (providing that a waiver may be clearly inferred from the actions and words of the person interrogated).

Defendant otherwise relies on Leany's report and claim that this case is similar to *Garibay* in responding to authority figures. (*See* ECF No. 35 at 11–12.) However, the holding in *Garibay* rested upon much more than responsiveness to authority, of which the paramount concern appeared to be the lack of interpretation provided to Garibay, whose primary language was Spanish. *See Garibay* 143 F.3d at 538–39 (providing considerations to guide an "knowing and intelligent" inquiry). Here, Defendant is a native

///

---

[14]The definition of interrogation extends to "words or actions on the part of police officers that they should have known were likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301–02 (1980).

English speaker—and specifically able to read and understand the words making up the *Miranda* warnings—who was advised of his rights at the beginning of his interrogation by Pittman. At no point did Defendant indicate a lack of comprehension of the warnings or of his rights. Nor does Defendant argue that Pittman coerced his waiver in any way; the Court saw no indications of such in viewing the relevant video (ECF No. 35-1). Accordingly, the Court finds Defendant's reliance on *Garibay* unavailing. Defendant''s other intertwined contentions largely goes to voluntariness, which the Court discusses *infra*.

As to Hurley's interrogation of Defendant, the Court is greatly concerned with the way Hurley engaged with Defendant, including waiting until over 30 minutes into his verbal exchange with Defendant before reading Defendant his *Miranda* rights and obtaining Defendant's signed waiver. Hurley's conduct surely is not best practice in providing procedural safeguards for the accused. Nonetheless, while Defendant argues that Defendant's waiver as to Hurley suffered from the same claimed lack of formalities as with Pittman (ECF No. 35 at 13), by extension of the Court's finding of intelligent and knowing waiver *supra*, the Court concludes that under Ninth Circuit authority such waiver extended to Hurley's questioning. *See, e.g.*, *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1128–29 (9th Cir. 2005) (supporting that there is no p*er se* constitutional requirement that *Miranda* warnings be reissued after a period of time and finding no violation where 14 hours had lapsed between the end of the first mirandized interrogation and the second interrogation).

The Court's conclusion is not altered by Defendant's apparent assertion that he later invoked his right to be silent when Defendant stated "This shit is making me mad. I don't even want to answer no more questions just because of the fact that I'm trying to tell you everything." (ECF No. 35-5 at 1:48:14–20). (ECF No. 35 at 14.) The government argues that this type of ambiguous invocation is insufficient. (ECF No. 47 at 7.) The Court agrees. *See, e.g.*, *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) ("An invocation of the right to remain silent must be unambiguous"); *cf. Davis v. United States*, 512 U.S. 452, ///

1  462 (1994) ("Maybe I should talk to a lawyer" is insufficient to trigger Fifth Amendment

2  right to counsel).

3  Accordingly, the Court finds that Defendant's waiver of his *Miranda* rights was

4  knowing and intelligent as to Pittman, and by extension Hurley. The Court next turns to

5  the issue of whether Defendant's statements to Pittman and Hurley were voluntary. (*See*

6  ECF No. 35 at 15–19.)

7  ### 2.  Voluntariness

8  The issue of voluntariness involves mixed questions of law and fact. *Miranda*, 384

9  U.S. at 515 n.11 ("Of course, the use of terms like voluntariness involves questions of law

10  and terminology quite as much as questions of fact."). The ultimate question is whether a

11  confession (or response) is obtained in a manner that comports with due process. *Miller*

12  *v. Fenton*, 474 U.S. 104, 110, 112 (1985).[15] "[C]oercive police activity is a necessary

13  predicate to the finding that a confession is not 'voluntary' within the meaning of the Due

14  Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167

15  (1986); *see also id.* at 163–64 ("While each confession case has turned on its own set of

16  factors justifying the conclusion that police conduct was oppressive, all have contained a

17  substantial element of coercive police conduct."); *Doody v. Ryan*, 649 F.3d 986, 990, 1023

18  (9th Cir. 2011) (en banc) (citation omitted) ("The determination [of voluntariness] depends

19  upon a *weighing* of the circumstances of pressure against the power of resistance of the

20  person confessing."). The Supreme Court has also explained that "the admissibility of a

21  confession turns as much on whether the techniques for extracting the statements, as

22  applied to *this* suspect, are compatible with a system that presumes innocence and

23  assures that a conviction will not be secured by inquisitorial means *as on* whether the

24  defendant's will was in fact overborne." *Miller*, 474 U.S. at 116 (emphasis added).

25  In arguing that his statements were involuntary, Defendant points out, *inter alia*,

26  that: the time from his seizure/arrest through the interrogations lasted over 11 hours,

27  ///

28  [15]Although *Miller* is a matter in habeas corpus, the Court finds its cited propositions equally applicable here.

during which he was repeatedly confronted with evidence of guilt and his explanations were consistently rejected. (ECF No. 35 at 4–7, 16–17.) The defense highlights that Defendant was barely 18 at the time of his interrogations, suffers from epilepsy, was forced to stay awake, although tired, sleepy, and shivering, while expressing worry about his epilepsy. (*Id.*)

Defendant also repeats Leany's findings concerning Defendant's processing speed and working memory as well as his potential suggestibility and predisposition to acquiesce to authority. (*E.g.*, *id.* at 16–19.) Relying on *Preston*, Defendant also points out the Ninth Circuit's findings regarding the effect of a low IQ and a defendant's suggestibility relative to coercive techniques by the police, noted *supra* and *infra* (*Id.* at 15–16.) The defense points to the following exchange regarding the burglaries as an example of the kind of authority condition that leads a susceptible person with certain cognitive deficits to acquiesce:

> DETECTIVE HURLEY: I got some issues going on because I have videos of two incidents where people broke into gun stores and stole guns, these guns, two days ago, okay.
>
> [DEFENDANT]: Uh-huh
>
> DETECTIVE HURLEY: So what do you know about that?
>
> [DEFENDANT]: *I don't know nothing about that.*
>
> DETECTIVE HURLEY: Are you sure?
>
> [DEFENDANT]: Yeah. No. I'm sure about that.
>
> DETECTIVE HURLEY: Because we're going to be straight up, you and me.
>
> [DEFENDANT]: No. That —
>
> DETECTIVE HURLEY: We need to get this shit out on the table, okay.
>
> [DEFENDANT]: That's for sure. That—not that—
>
> DETECTIVE HURLEY: Okay.
>
> [DEFENDANT]: —is some—I don't know, but, nah. I don't know nothing about that.
>
> DETECTIVE HURLEY: You sure?

[DEFENDANT]: Yeah.

(*Id.* at 18–19; ECF No. 47 at 9–10; ECF No. 35-3 at 47–48.)

The government counters, arguing that Defendant's position that his statements were involuntary is untenable based on the circumstances. (ECF No. 47 at 8–10.) Setting aside the coldness of the interrogation room,[16] the government argues that *Preston* is distinguishable because the defendant there was established as having an unusually low IQ that rendered him more susceptible to interrogative pressures, unlike Defendant here. (*Id.* at 8–9.) As noted, the Court agrees with the government regarding the issue of IQ/cognitive impairment. The government additionally highlights that despite the coercive elements Defendant proffers, Defendant persisted in his denials. (*Id.* at 9 (providing examples).) The government contends that the exchange referenced by Defendant is a perfect example that Defendant was not susceptible to interrogative pressures, as found in *Preston*, because Defendant never in fact succumbed to providing the answer Hurley appeared to be seeking. (*Id.* at 9–10.)

The example pointed out by Defendant is remarkable in that it undermines Leany's statements regarding suggestibility based on cognitive impairments. As Defendant pinpoints, Leany's report provides that "[f]or those who are prone to acquiesce to authority and more so for those with executive dysfunction and memory issues who are likely to be uncertain about those abilities, there is a shift of responding to appease the authority figure regardless of the accuracy of the information." (ECF No. 35 at 19 (citing ECF No. 36 at 11).) Unquestionably, in the pinpointed exchange, there was no shift in Defendant denying that he did not burglarize the Stores. The *exchange* therefore does not suggest that Defendant was atypically predisposed to acquiesce to authority.

///

---

[16]The government contests whether Defendant was shivering because the interrogation room was in fact cold as opposed to Defendant perceiving the room as cold based on his admitted nervousness. (ECF No. 47 at 8.) The government notes that Hurley, for example, was not visibly cold albeit not wearing a jacket or sweater. (*Id.* at 4.) Based on the video, it appears Defendant was merely wearing a windbreaker, not a jacket that produces meaningful warmth. In any event, being cold is relative and often depends on an individual's own disposition.

In any event, the Court has already indicated that Defendant's claimed deficits do not appear to be of the degree to affect the Court's voluntariness calculus here. That is not to say that found cognitive deficits should never be a meaningful factor. The Court simply concludes that the video evidence here suggests the issue should not be given such weight. The Court therefore looks to whether under all the other circumstances—including the duration of Defendant's entire interrogation at the police station,[17] Defendant's apparent discomforts from being cold and tired (and sleepy), his epilepsy, as well as his "age, . . . lack of sophistication, and the interrogation techniques used" here is coercive conduct by the police that overbore Defendant's will. *See, e.g.*, *Preston*, 751 F.3d at 1020. The Court also looks at whether the interrogations otherwise align with expectations of due process.

As an initial matter, Defendant particularly points out repetitive questioning, long duration of questioning, refusal to accept Defendant's answers, confrontation with evidence of the burglaries relative to Defendant's denial of participation, and questioning while Defendant was cold and tired as part of the interrogative techniques used by officers here. (ECF No. 35 at 16–19.)[18]

As to time, Defendant was arrested after 8 p.m. on September 30 and, as clarified by testimony at the Hearing, was interrogated by Pittman around 10 p.m. Hurley began his interrogation after 3 a.m., which occurred over roughly 4 hours. The defense pointed out at the Hearing that at no point was Defendant told he could call someone—for example, his mother with whom he lived. The Court finds that the length of Defendant's interrogations and that he was held incommunicado before it was over favors a finding of

///

///

---

[17]To the extent Defendant notes examples of coercive techniques that preceded Defendant's interrogations at the police station, the Court does not find them instantly relevant.

[18]The Court is not convinced that those techniques considerably extends to Pittman.

26

involuntariness.[19] *See, e.g.*, *Haley v. Ohio*, 332 U.S. 596 (1948) (finding confession in violation of the constitution where 15-year-old questioned from midnight to 5 a.m. and held incommunicado during that time); *Spano v. New York*, 360 U.S. 315 (1959) (finding adult interrogated, which *inter alia*, lasted for approximately eight hours inconsistent with the Fourth Amendment under traditional principles); *see also Miranda*, 384 U.S. at 476 (expressing that the fact that an accused's statement was made after "lengthy interrogation or incommunicado incarceration . . . is inconsistent with any notion of a voluntary relinquishment of the privilege [against self-incrimination]"); *Crowe v. County of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010) (holding, in a civil rights action, that the police interrogations of two juvenile suspects—14 and 15 years old—violated their "Fourteenth Amendment rights to substantive due process" because the teenagers "were isolated and subjected to hours and hours of interrogation during which they were cajoled, threatened, lied to and relentlessly pressured by teams of police officers"). The fact that Defendant was not permitted to call his mother until only after the interrogations were over strongly suggests that keeping Defendant incommunicado was part of the interrogation tactics.

Further, as indicated, Defendant's age also favors a finding of involuntariness. Although not legally a minor, it is undisputed that Defendant was only months past his eighteenth birthday. Thus, it is hard for this Court to see an intellectual-developmental distinction between Defendant and say a 17-year-old that would force a different conclusion regarding the questionable nature of circumstances faced. For comparison, the Ninth Circuit has found an interrogation coercive where a "sleep deprived" teenager— like Defendant here, albeit 17-year-old—was interrogated by a "tag team of detectives" in

///

---

[19]To the extent it may be concluded that the interrogation resumed after 3 a.m. only because Hurley drove from Sparks, Nevada to Vallejo, California, to conduct his interrogation, the Court finds the thought limited in scope. The counterview is that there is no indication that Defendant was told that his interrogation would be delayed beyond the short period of time during which Pittman stated he would return to continue his questioning of Defendant. Nor is there any explanation why Defendant was not given the opportunity to contact his mother during this time, or why the room temperature was not adjusted, among other things.

"relentless, nearly thirteen-hour interrogation." *Doody*, 649 F.3d at 1023; *see also id.* at 1011 ("In sum, under the law, and as a matter of fact and common knowledge, Doody's participation in ROTC, his not-yet-completed high school studies, his work as a grocery store bagger, his ability to speak English as a second language and his lack of mental disability in no way lessen the Supreme Court's instruction regarding the special caution with which we review a confession extracted from a teenager."). To be sure, while being interrogated by Pittman, Defendant appeared to be *sufficiently* alert and lucid. However, upon entering the interrogation room to meet with Hurley, Defendant was unambiguously tired as evidence by his body language—he yawned throughout Hurley's questioning; he frequently folded his arms on the desk to rest his head; and he complained about being tired. Defendant was also obviously cold—he was shivering—and said so. At one point, Defendant expressed being completely oblivious to the time—not knowing it was already after 3 a.m.

Defendant's epilepsy—and Hurley's evident lack of concern for that condition—also weighs in favor of finding involuntariness.[20] Defendant at least twice noted that he is epileptic. (*E.g.*, ECF No. 35-3 at 43, 227.) But despite Defendant's age and tiredness, he was not asked if he needed to take medication, much less offered the option of calling for medication. To be sure, it was established at the Hearing that Defendant had then been taking medication for his epilepsy (*see* ECF No. 36 at 4–5). *See, e.g*, *Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (per curiam) (finding statements involuntary in the totality of the circumstances, which included lack of food, sleep, and medication for high blood pressure). Instead, throughout the interrogation, Hurley largely brushed aside Defendant's statements about being cold, diminished the statements about epilepsy, and took no meaningful step to address or consider Defendant's apparent tiredness. Hurley simply

///

///

---

[20] Ironically, this is juxtaposed the fact that at the Hearing the government made it a point to request that Hurley be permitted to eat snacks or take a break during testimony due to his being diabetic.

continued on with his questioning. Again, this is all colored by the fact that Defendant was only months into the age of 18.

Under all these circumstances, Defendant would surely wonder when the inquisition by Hurley would end. While Hurley had told Defendant that he could stop talking (*e.g.*, ECF No. 35-5 at 38:16–38:27), it appears that to Defendant, the setting indicated that he would be held accountable for what he was being accused of, whether he spoke or not. (*See, e.g.*, ECF No. 35-5 at 1:48:14–20 ("This shit is making me mad. I don't even want to answer no more questions just because of the fact that I'm trying to tell you everything.")); *id.* at 1:48:20–28 (indicating a belief that Hurley was twisting his statements and that his responses were "not going to ever matter").) Echoing the Supreme Court's ruling in *Haley*, the Court "cannot indulge" the assumption that Defendant had a "full appreciation" of his "freedom of choice" based on mere recitals of his rights. *Haley*, 332 U.S. at 601.

> Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them.[21] They may not become a cloak for inquisitorial practices and make an empty form of the due process of law for which free men fought and died to obtain.

*Id.*

While the Court does not find that voluntariness of Defendant's statements is implicated relative to his interrogation by Pittman, it concludes differently as to Hurley. Defendant's visible tiredness throughout the Hurley interrogation—which alone was nearly four hours in the earliest hours of the morning, the effect that the overall duration of Defendant's interrogations and lack of sleep likely had on Defendant's mental capacity, particularly in light of his young age, and the absence of his epilepsy medication, is of utmost concern to the Court. Of course, the Court recognizes that its voluntariness conclusion may be a close call. *See, e.g.*, *Haynes v. Washington,* 373 U.S. 503, 515

///

---

[21]One obvious fact of life is that Defendant is a black teenager, who, given the current social discourse and dynamics between police and his community generally, would not be baseless in assuming that he was at the behest of Hurley's mercy.

(1963) ("The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused."). On one hand, Defendant's will was not apparently overborne by interrogative tactics to the extent of providing all the answers Hurley likely desired immediately when Hurley wanted them. On the other hand, suppression would be a non-issue if Defendant did not make inculpatory statements that the government will seek to use against him in prosecuting the crimes with which he is charged. Thus, the Court cannot conclude that Defendant's will was in no way meaningfully overborne by Hurley's questioning.

To be clear, the Court's conclusion is that the totality of the circumstances warrants suppression, as to Hurley. That conclusion is evermore compelled by the fact that our system is an accusatorial system of justice—not an inquisitorial one. *See Miller*, 474 U.S. at 109–10 (explaining that the Supreme Court's voluntariness analysis "has consistently been animated by the view that 'ours is an accusatorial and not an inquisitorial system, '. . . and that, accordingly, tactics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness"). In this vein, the Court finds the manner of Hurley's interrogation as applied to this particular young man, as noted: lacking regard for Defendant's age—in terms of providing safeguards,[22] dismissing Defendant's medical condition and his statements of being cold as well as his extreme tiredness for the sake of continuous and prolonged questioning, is incompatible with substantive due process and a system of presumed innocence. For these reasons, the Court will grant Defendant's motion to the extent he seeks suppression of statements to Hurley.

///

///

_____

[22]Relatedly, in response to defense counsel raising the issue of Defendant's age at the Hearing, Hurley firmly stated that Defendant was an adult. But, while Defendant is legally an adult, commonsense advises that he was functionally a minor, having only recently turned 18.

In sum, Defendant's motion to suppress his statements made while in the Officers' patrol car is granted because he was not read his *Miranda* rights although formally arrested at that time. It is granted with regard to Hurley's questioning at the police station for lack of voluntariness.  It is denied with regard to Pittman's questioning at the police station.

**V.    CELL PHONE WARRANT (ECF NO. 34.)**

Defendant moves to suppress the contents found on his Phone, arguing: (1) the warrant for the search of the Phone was obtained based on illegally acquired information; (2) the warrant is impermissibly a *de facto* general warrant because it is overbroad; and (3) that there was a flagrant disregard for the warrant's temporal limitations in its execution. (*E.g.*, ECF No. 34 at 1.) The government effectively argues that the warrant affidavit, submitted By Special Agent Michael C. Giacomantonio ("Affidavit"), did not rely on tainted evidence to obtain a warrant, claiming as it does *supra* that officers lawfully obtained the evidence from the physical search of Defendant and the car—particularly the stolen firearms. (ECF No. 46 at 2.)[23] The government additionally asserts that the good faith exception applies here, claiming that the agent who obtained the warrant acted in good faith in doing so. (*Id.* at 2–3.)

Notably, the government concedes that suppression is warranted to the extent the execution of the warrant exceeded its scope. (*Id.* at 1.) Defendant, however, argues tor total suppression for this reason (ECF No. 51 at 3–4). *But see, e.g.*, *United States v. Crozier*, 777 F.2d 1376, 1381 (9th Cir. 1985) ("Only those items which fall outside the scope of the warrant need be suppressed."). While the Court does not find total suppression based on the execution alone, the Court agrees with Defendant that total

///

---

[23]In passing, the government states that Defendant gave consent to search his Phone, but agents applied for a search warrant. (ECF No. 46 at 2.) The issue is not sufficiently briefed and neither party meaningfully addressed the issue at the Hearing. Moreover, the Court found Hurley's attempt to have Defendant give him access to the phone absolutely problematic, particularly in light of Defendant's exhaustion and the other factors that led to the Court's finding that his waiver of *Miranda* rights was involuntary. (*E.g.*, ECF No. 42:10–42:40; 3:30:00–3:31:20.)

1  suppression is warranted here—on both the additional grounds of a tainted warrant and

2  that the warrant is impermissibly overbroad.

3                        **A.    Application of the Exclusionary Rule**

4          Defendant relies on the exclusionary rule to argue that the evidence obtained from

5  his Phone should be suppressed because the warrant was "irredeemably tainted" by

6  illegally obtained evidence. (ECF No. 34 at 2.) The Court agrees.

7          "The exclusionary rule has traditionally barred from trial physical, tangible materials

8  obtained either during or as a direct result of an unlawful invasion." *Wong Sun v. United*

9  *States*, 371 U.S. 471, 485 (1963). "[V]erbal evidence which derives so immediately from

10  an unlawful entry and an unauthorized arrest . . . is no less the 'fruit 'of official illegality

11  than the more common tangible fruits of the unwarranted intrusion." *Id.* The exclusionary

12  rule also applies to warrants obtained through reliance on illegally acquired facts. *United*

13  *States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987).

14          However, "[t]he mere inclusion of tainted evidence in an affidavit does not, by itself,

15  taint the warrant or the evidence seized pursuant to the warrant." *Id.* "A reviewing court

16  should excise the tainted evidence and determine whether the remaining, untainted

17  evidence would provide a neutral magistrate with probable cause to issue a warrant." *Id.;*

18  *see also United States v. Gomez–Soto,* 723 F.2d 649, 654 (9th Cir. 1984) (recognizing

19  that doctrine of severance—"which allows [a court] to strike from a warrant those portions

20  that are invalid and preserve those portions that satisfy the Fourth Amendment").

21          An affidavit establishes probable cause for the issuance of a warrant where it

22  presents a "fair probability that contraband or evidence of a crime will be in a particular

23  place." *Illinois v. Gates,* 462 U.S. 213, 238 (1983). Great deference is given to an issuing

24  judge's finding that probable cause supports a warrant. *United States v. Flores*, 802 F.3d

25  1028, 1043 (9th Cir. 2015). That finding is reviewed for clear error. *Id.* Notably, a search

26  warrant is not rendered invalid "so long as the issuing judge had a substantial basis for

27  concluding that the supporting affidavit established probable cause." *Id.* (citing *United*

28  *States v. Crews,* 502 F.3d 1130, 1135 (9th Cir. 2007)).

Here, the Court finds that the Affidavit is unsupported by probable cause with the exclusion of tainted evidence. The Affidavit, connects the Phone to criminal activity only by virtue of the discovery of the firearms during the inventory search and responsive statements Defendant made while in the patrol car and chiefly to Hurley. (ECF No. 34-1 at 3, 5–7.) However, as the Court concluded *supra*, the inventory search, the questioning in the patrol car, and questioning by Hurley violated Defendant's constitutional rights. Upon excising this impermissible evidence from the Affidavit, there is no probable cause to support issuance of the search warrant. For this reason, the Court finds that the search of Defendant's Phone was not properly conducted pursuant to a valid warrant. Therefore, the contents retrieved from the Phone, beyond the government's concession regarding execution, will be suppressed.

### A. Whether the Warrant Amounts to an Unconstitutional General Warrant

The Court further agrees with Defendant that the search warrant was impermissibly overbroad in violation of constitutional safeguards. (ECF No. 34 at 4–8.) Defendant specifically contends that there is a lack of a probable cause nexus between the Phone and the burglaries at issue. (*E.g.*, ECF No. 51 at 1–3.) To support his position, Defendant highlights that none of the suspects in the video footage from the burglary was seen with a cell phone and there is nothing inherent with the crime of burglary that requires the use of a cell phone. (*Id.* at 2.)

In examining whether the warrant here is overbroad, the Court considers three factors:

> (1) whether probable cause existed to seize all items of a category described in the warrant; (2) whether the warrant set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not; and (3) whether the government could have described the items more particularly in light of the information available.

*Flores*, 802 F.3d at 1044 (quoting *United States v. Lei Shi*, 525 F.3d 709, 731–32 (9th Cir. 2008)). In conducting its analysis, the Court is reminded that a warrant is particularly

susceptible to being overbroad when it authorizes the search and seizure of electronically-stored information. *Id.* at 1044–45. In order to prevent a warrant for electronically-stored information from becoming a general dragnet, the warrant must: (1) "specify the particular crime for which evidence is sought;" (2) prohibit retention of unresponsive information under a "plain-view" doctrine; (3) protect third party rights by segregating unresponsive information. *Id.* at 1045.

Beyond the absence of probable cause when the impermissible evidence is excised, the Court finds, as Defendant argues (*e.g.*, ECF No. 34 at 7), that the warrant lacks procedural safeguards to prevent the seizure and retention of information outside the scope of the related criminal activity. In fact, the warrant provides no standards for its execution, such as providing search methodology for segregating non-responsive information. (*See* ECF No. 34-2.)

Nor is the warrant sufficiently particularized. For example, the warrant permits search of the Phone extending back to September 25, 2018. (*Id.* at 5.) That is four days before the burglaries mentioned in the warrant affidavit. (*Compare id. with* ECF No. 34-1 (providing September 29, 2018, as the day of both asserted burglaries).) This timeframe is particularly noteworthy because the agent's provided basis for searching the Phone is that, based on his experience and training, cell phones are used for the quick sale of stolen firearms and that the large amounts of cash found on Defendant supports such sales. (ECF No. 34-1 at 6–7.) Logically then, no such sales were likely to have occurred until after the burglaries. Even if sales may have been prearranged, the agent failed to explain the basis for the request to reach back four days as opposed to say ten or one. Further, Defendant's statements that the agent cites in the Affidavit does not suggest the possibility that there were prearranged sales before the burglaries. (*See id.* at 7.) The absence of more definite limitations, both in timeframe and methodology, raises great due process concerns given that "[w]ith all that they contain and all they may reveal, [cell phones] hold for many Americans the 'privacies of life.'" *Riley v. California*, 573 U.S. 373, 403 (2014)

///

(citation omitted). At minimum, for these reasons, the Court concludes that the warrant was impermissibly overbroad.[24]

The Court therefore suppresses the content retrieved from Defendant's Phone pursuant to the warrant. Specifically, beyond improper execution of the warrant, the Court finds it is unsupported by probable cause when the impermissible information is excised and that the warrant is overbroad.

## VI.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

It is therefore ordered that Defendant's motion to suppress physical evidence (ECF No. 38) is granted in part and denied in part. It is denied to the extent Defendant challenges the search of his person. It is otherwise granted. Accordingly, the firearms and other items found during the search of the car are suppressed. The cash, Phone, and car keys found on Defendant will not be suppressed.

It is further ordered that Defendant's motion to suppress statements in violation of *Miranda* requirements (ECF No. 35) is granted in part and denied in part. It is granted as to the responsive statements Defendant made while arrested in the patrol car. It is also granted with regard to the statements Defendant made to Hurley while in custody at the police station based on the Court's finding of involuntariness. It is denied as to questioning by Pittman while at the police station.

///

///

///

///
_____

[24]The Court also finds that the agent's statement that cell phones are used for quick sale of stolen firearms is only a little more that stating that people generally use phones to communicate for various reasons.

35

1       It is further ordered that Defendant's motion to suppress the warrant to search his

2 Phone (ECF No. 34) is granted in its entirety. All content retrieved from Defendant's Phone

3 pursuant to the warrant is suppressed.

4       DATED THIS 26th day of December 2019.

5

6                                             _____

                                        MIRANDA M. DU

7                                         CHIEF UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28